UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOHN CURTIS RICE,
            Plaintiff

                    v.

MUSEE LINGERIE, LLC,
            Defendant.

Docket No. 18-cv-9130

## NOTICE OF SUPPLEMENTAL AUTHORITY

Defendants Musee Lingerie, LLC respectfully requests the Court consider the following cases as supplemental authority in Support of Defendant's Request For Bond Under Local Rule 54.2: <u>John Curtis Rice v. NBCUniversal Media LLC</u>, No. 19-cv-447 (JMF) 2019 WL 3000808 (S.D.N.Y. July 10, 2019)(Order imposing $8,745.50 sanction against Richard Liebowitz and the Liebowitz Law Firm, and confirming up to $570 per hour is a reasonable rate for copyright infringement work in the Southern District of New York); <u>Craig v. UMG Recording, Inc.</u>, No. 16-cv-5439 (JPO) (S.D.N.Y. July 9, 2019)(denying motion for reconsideration of imposition of $98,532.62 sanction against Richard Liebowitz and the Liebowitz Law Firm); <u>Craig v. UMG Recording, Inc.</u>, No. 16-cv-5439 (JPO) (S.D.N.Y. March 29, 2019) (imposing a sanction of $98,532.62 against Richard Liebowitz and the Liebowitz Law Firm). These decisions are attached hereto as Exhibits A, B, and C, respectively, for the Court's convenience.  Defendant respectfully submits that these cases bear on its argument that the Court must impose a bond requirement of no less than $25,000 on Plaintiff to allow this matter to move forward.

PAUL FRANK + COLLINS P.C.
ATTORNEYS AT LAW
P.O. BOX 1307
BURLINGTON, VERMONT 05401

DATED this 16th day of July, 2019.

                      MUSEE LINGERIE, LLC

BY:    PAUL FRANK + COLLINS P.C.

BY:    _____*/s/ David M. Pocius*_____
              David M. Pocius (#640595)
              PO Box 1307
              Burlington, VT 05402-1307
              802.658.2311/ dpocius@pfclaw.com

7653060_1:13501-00001

PAUL FRANK + COLLINS P.C.
ATTORNEYS AT LAW
P.O. BOX 1307
BURLINGTON, VERMONT 05401

# EXHIBIT A

2019 WL 3000808
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

JOHN CURTIS RICE, Plaintiff,

v.

NBCUNIVERSAL MEDIA, LLC, Defendant.

19-CV-447 (JMF)
|
Filed 07/10/2019

OPINION AND ORDER

JESSE M. FURMAN United States District Judge

**\*1** In his relatively short career litigating in this District, Richard Liebowitz has earned the dubious distinction of being a regular target of sanctions-related motions and orders. Indeed, it is no exaggeration to say that there is a growing body of law in this District devoted to the question of whether and when to impose sanctions on Mr. Liebowitz alone. *See, e.g.*, *Pereira v. 3072541 Canada Inc.*, No. 17-CV-6945 (RA), 2018 WL 5999636, at \*2 (S.D.N.Y. Nov. 15, 2018); *McDermott v. Monday Monday, LLC*, No. 17-CV-9230 (DLC), 2018 WL 5312903, at \*2-3 (S.D.N.Y. Oct. 26, 2018) (citing cases); *Steeger v. JMS Cleaning Servs., LLC*, No. 17-CV-8013 (DLC), 2018 WL 1363497, at \*3 (S.D.N.Y. March 15, 2018); *Craig v. UMG Recordings, Inc.*, No. 16-CV-5439 (JPO), 2019 WL 1432929, at \*10 (S.D.N.Y. Mar. 29, 2019). This Opinion is the latest contribution to that body of law. For the reasons stated below, the Court concludes that sanctions should indeed be imposed on Mr. Liebowitz for his repeated failure to comply with this Court's orders, failures that imposed considerable and unwarranted costs on the Court, its staff, and Defendant NBCUniversal Media, LLC.

BACKGROUND

Plaintiff John Curtis Rice filed this Complaint, bringing claims under the Copyright Act, 17 U.S.C. § 101 *et seq.*, on January 16, 2019. *See* Docket No. 1. The Complaint alleges that Defendant NBCUniversal Media, LLC, infringed Rice's rights by displaying a copyrighted photograph — depicting the removal of a wild racoon from a beauty shop in the Bronx — on one of its websites. *See id.* More specifically, the Complaint alleges that "NBC did not license the Photograph from Plaintiff for its article, nor did NBC have Plaintiff's permission or consent to publish the Photograph on its Website." *Id.* ¶ 11; *see also id.* ¶ 13 ("NBC is not, and has never been, licensed or otherwise authorized to reproduce, publically display, distribute and/or use the Photograph."). On January 17, 2019, the Court ordered that the parties appear for an initial conference on May 2, 2019, and ordered them to conduct a mediation session prior to that initial conference. *See* Docket Nos. 6, 7.

NBCUniversal maintains — as it has since early in the case, *see* Docket No. 34 ("Transcript" or "Tr."), at 2-3 — that it did not infringe Plaintiff's copyright because it had a license for online use of Plaintiff's photograph. *See, e.g.*, Docket No. 15, at 3 ¶ 1 (providing the affirmative defense that "NBCUniversal had the express and/or implied license to utilize the Photograph"); Docket No. 16, at 2. In or about mid-March 2019, according to defense counsel, NBCUniversal "produced the evidence supporting its complete license defense" by disclosing to Liebowitz a $200 invoice for "the online Today Show use of the ... image of Raccoon capture, Bronx, NY." Docket No. 27 ("Lerner Decl.") ¶¶ 2, 6; *see also* Docket No. 27-1 (invoice). Following a discussion with his client, Liebowitz took the position that the license was for one year and that the one-year license had been exceeded. *See* Lerner Decl. ¶ 6; *see also* Docket No. 26 ("Liebowitz 1st Decl.") ¶ 6. Liebowitz did not, however, "produce any documentary evidence to support his position ... nor did [he] amend [the] Complaint to correct the allegation that there was no license or permission to publish the Photograph." Lerner Decl. ¶ 7.

**\*2** On April 1, 2019, the Court-annexed Mediation Program closed the mediation referral, noting in the docket entry that "one or both parties failed, refused to attend, or refused to participate in the mediation." Docket No. 14. In a joint letter to the Court in advance of the initial conference, defense counsel represented that NBCUniversal had "indicated that it was willing to participate in mediation and provided available dates to the mediation office, but Plaintiff did not." Docket No. 16. Liebowitz now blames his client's unavailability for his own failure to attend mediation, *see* Liebowitz 1st Decl. ¶ 17 ("Sanctions should not be imposed for Rice's inability

to attend mediation."), but Liebowitz did not inform the Mediation Office (let alone the Court) of this conflict, *see* Lerner Decl. ¶ 10. Instead, as defense counsel notes, Liebowitz "simply did not respond" to the Mediation Office's scheduling emails. *Id.* As of the initial conference, no mediation session was held and no relief from the mediation order had been sought or granted — a clear violation of the Court's January 17th Order.

On May 1, 2019, Liebowitz filed two requests with respect to the May 2nd initial pretrial conference. First, at 3:19 p.m., Liebowitz filed a letter motion requesting that the Court change the time of the conference from 3:45 p.m. to 10:45 a.m. *See* Docket No. 18. The Court grudgingly granted the request, noting that it "would have been on firm ground denying counsel's request — on the ground that it is untimely and inadequately explained." Docket No. 19. The Court warned that at the May 2nd conference, "counsel should be prepared to explain the timing and reason for the request." *Id.* Later the same day, at 11:09 p.m., Liebowitz filed a stipulation of voluntarily dismissal signed by both parties, *see* Docket No. 20, and six minutes later, a letter motion to cancel the May 2nd conference, *see* Docket No. 21. The Court denied the request to cancel the conference the next morning at 9:29 a.m. Docket No. 22. In denying the request, the Court ordered that "[c]ounsel (including Mr. Liebowitz himself) shall appear as scheduled, in part so Plaintiff's counsel can answer for his apparent failure to comply with this Court's orders and rules, including its orders regarding early mediation." *Id.*

Despite the Court's clear order, Liebowitz did not appear for the May 2nd conference. When the Court's staff contacted Liebowitz's office, it "got somewhat conflicting information about whether he was out of town or on his way." Tr. 2. At the conference, the Court asked defense counsel to explain what had occurred on May 1st and before. *Id.* (Notably, defense counsel advised that, "until the eve of the initial pretrial conference, Plaintiff continued to press for settlement, despite the evidence of a valid license." Lerner Decl. ¶ 11; *see also* Tr. 3-4.) The Court also noted at the conference that it would "sign the stipulation of dismissal retaining jurisdiction to adjudicate any sanctions issue." Tr. 7. Later that day, at 4:04 p.m., the Court signed and docketed the parties' stipulation of dismissal. *See* Docket No. 23. By endorsement, the Court specifically "retain[ed] jurisdiction to consider whether sanctions should be imposed upon Plaintiff's counsel." *Id.* The Court also ordered Liebowitz to show cause in

writing why sanctions should not be imposed pursuant to [Rules 11](#) and [16 of the Federal Rules of Civil Procedure](#) and the Court's inherent authority. *See* Docket No. 25. In response, Liebowitz submitted two declarations, *see* Liebowitz 1st Decl.; Docket No. 30 ("Liebowitz Reply Decl."), and defense counsel submitted a declaration and a letter with contemporaneous billing records, *see* Lerner Decl.; Docket No. 33 ("Time Records").

## DISCUSSION

It is well established that, when counsel violates a court order or fails to appear at a conference, sanctions may be imposed pursuant to either [Rule 16 of the Federal Rules of Civil Procedure](#) or the Court's inherent authority. *See* [Fed. R. Civ. P. 16(f)(1)](#); [Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991)](#). Such sanctions may be imposed in response to a motion or by the Court *sua sponte*. *See* [Fed. R. Civ. P. 16(f)(1)](#) (noting that the Court may impose sanctions "[o]n motion or on its own"); [Chambers, 501 U.S. at 43-44](#). Moreover, the Court may impose sanctions on the lawyer or the lawyer's firm. *See, e.g.*, [Pichardo v. C.R. Bard, Inc., No. 09-CV-7653 (SHS), 2015 WL 13784565, at *7 (S.D.N.Y. Jan. 26, 2015)](#); [Shiu v. Jung & Assocs. Law Office P.C., 559 F. App'x 105, 106 (2d Cir. 2014)](#) (summary order) (affirming imposition of [Rule 16(f)](#) sanctions "jointly and severally" on a law firm). The decision whether to impose sanctions is left to the Court's discretion. *See, e.g.*, [Macolor v. Libiran, No. 14-CV-4555 (JMF), 2015 WL 337561, at *2 (S.D.N.Y. Jan. 23, 2015)](#).

### A. Sanctions Pursuant to [Rule 16(f)](#)

 **\*3** The Court begins with [Rule 16](#). [Rule 16(f)](#) authorizes sanctions for, among other things, the "fail[ure] to obey a scheduling or other pretrial order." [Fed. R. Civ. P. 16(f)(1)(C)](#). "In deciding whether a sanction is merited [under [Rule 16(f)](#)], the court need not find that the party acted in bad faith." [Huebner v. Midland Credit Mgmt., Inc., 897 F.3d 42, 53 (2d Cir. 2018)](#) (internal quotation marks omitted). The Court need find only that there is clear and convincing evidence that counsel disregarded a clear and unambiguous scheduling or other pretrial order. *See id.* ("The fact that a pretrial order was violated is sufficient to allow some sanction." (internal quotation marks omitted)); *see, e.g.*, [S. New England Tel. Co. v. Glob. NAPs Inc., 624 F.3d 123, 145 (2d Cir. 2010)](#).

The Court has no trouble making that finding here. *See* Docket Nos. 6, 7. On January 17, 2019, the Court ordered that, "[u]nless and until the Court orders otherwise, the parties shall schedule a mediation to take place no later than two weeks before the initial pretrial conference." Docket No. 6, at 1 (emphasis omitted). The January 17th Order further stated that, "[i]f the parties believe that early mediation would not be appropriate ..., they shall file a letter motion seeking relief from the foregoing requirements no later than the deadline to answer." *Id.* The deadline to answer, after extension, was April 3, 2019. *See* Docket No. 12. Neither party sought relief from the early mediation requirement by that date; instead, on April 1, 2019, the Mediation Office reported that "the court-ordered mediation was not held as one or both parties failed, refused to attend, or refused to participate in the mediation." Docket No. 14.

The record reveals that Liebowitz is to blame for the failure to comply with the Court's January 17th order. Defense counsel explained that "[w]hen the mediation office reached out, we reached out and tried to get a phone call together with both attorneys and the mediation office. Mr. Liebowitz did not respond to the mediation office, leading to the subsequent closing of that file by the mediation office." Tr. 5-6; *see also* Docket No. 16 (statement in joint letter that "Defendant indicated that it was willing to participate in mediation and provided available dates to the mediation office, but Plaintiff did not"); Lerner Decl. ¶ 10 (Liebowitz "did not respond to the requests of the Mediation Office to respond regarding the status of the matter and possible dates for mediation"). Notably, Liebowitz does not dispute this; instead, he argues that sanctions should not be imposed for the failure to mediate because his client "was not able to find the availability to take off a full day from work." Liebowitz 1st Decl. ¶ 17. But Rice's purported lack of availability does not excuse Liebowitz's failure to comply with the January 17th Order. Liebowitz could have sought relief from the Court's Order on account of Rice's unavailability, but he did not do so; he simply failed to respond to the Mediation Office. That clear violation of the January 17th Order — which was intended to facilitate early resolution of the case — merits the imposition of sanctions under Rule 16(f). *See* Fed. R. Civ. P. 16(f)(1)(C); *see also* Huebner, *897 F.3d at 53*; Petrisch v. JP Morgan Chase, *789 F. Supp. 2d 437, 455 (S.D.N.Y. 2011)* (finding sanctions to be merited because the "unwillingness to

follow this Court's orders has wasted the time of both the Court and Defendants").

**B. Sanctions Pursuant to the Court's Inherent Authority**

The Court also imposes sanctions for Liebowitz's failure to comply with the Court's orders pursuant to the Court's inherent power to award sanctions. "[D]istrict courts have the inherent power" to sanction a party "for bad faith conduct violating the court's orders even if procedural rules exist which sanction the same conduct." *S. New England Tel, 624 F.3d at 144* (internal quotation marks omitted); *see also* Chambers, *501 U.S. at 50* ("[N]either is a federal court forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules."). Under this "inherent power ..., a court may assess attorney's fees as a sanction for the willful disobedience of a court order." Chambers, *501 U.S. at 45* (internal quotation marks omitted). To warrant an award of attorney's fees pursuant to the Court's inherent authority, the Court must find that Liebowitz acted in bad faith or that he willfully disobeyed the Court's orders. *See* id. at 50; *cf.* Huebner, *897 F.3d at 53* (finding that bad faith is not necessary to impose sanctions under Rule 16(f)).[1]

**\*4** Applying those standards here, the Court finds it appropriate to impose sanctions pursuant to its inherent authority for Liebowitz's failure to comply with both the January 17th Order mandating early mediation, discussed above, and his failure to appear at the May 2nd conference. In response to Liebowitz's (literal) 11th hour request to adjourn the conference in light of the stipulated dismissal, *see* Docket No. 21, the Court explicitly ordered that "[c]ounsel (including Mr. Liebowitz himself) shall appear as scheduled," Docket No. 22. Yet Liebowitz failed to comply with that unambiguous order.

Liebowitz now claims that his absence was excusable because he believed that "the Court lacked jurisdiction to conduct a Rule 16 conference" after the parties signed the stipulation of dismissal. *See* Liebowitz 1st Decl. ¶ 15. That claim is unpersuasive and, the Court finds, disingenuous. First, it is hard to credit given the letter — filed by Liebowitz himself — requesting adjournment of the conference six minutes after filing the stipulation of dismissal. *See* Docket Nos. 20, 21. Second, the claim

is without merit as a matter of law because voluntary dismissal "does not preclude the district court from considering collateral issues such as sanctions." *U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.*, 775 F.3d 128, 134 (2d Cir. 2014); *see In re Austrian & German Bank Holocaust Litig.*, 317 F.3d 91, 98 (2d Cir. 2003) ("Whenever a district court has federal jurisdiction over a case, it retains ancillary jurisdiction after dismissal to adjudicate collateral matters."). Thus, even if the Court no longer had jurisdiction to order attendance at a Rule 16 conference — a dubious premise — it plainly had authority to consider sanctions and to mandate counsel's appearance at a conference related to sanctions, as the May 2nd conference was. *See* Docket No. 22 (stating that the conference was "in part so Plaintiff's counsel can answer for his apparent failure to comply with this Court's orders and rules"). Third, Liebowitz's claim is hard to credit because other courts in this District have imposed sanctions on him even after settlement and dismissal. *See, e.g.*, *Steeger*, 2018 WL 1363497, at *1-2 (affirming sanctions imposed after settlement and imposing new sanctions even though the case had already been dismissed). And finally, "attorneys have no absolute right to be warned that they disobey court orders at their peril." *Huebner*, 897 F.3d at 54 (internal quotation marks omitted). Accordingly, the Court declines to credit Liebowitz's statement that he believed the Court lacked jurisdiction to hold a conference and declines to excuse Liebowitz's absence on that basis.

Additionally, the Court finds, for several reasons, that Liebowitz's disobedience of the Court's Orders — both the Orders requiring mediation and Liebowitz's appearance on May 2 — was willful. First, "these orders were explicit and there is no suggestion that [Liebowitz] misread or misunderstood them." *Petrisch*, 789 F. Supp. 2d at 455 (finding a willful violation of the Court's order under Rule 16). Second, because the Court declines to credit Liebowitz's excuses for his behavior, there is no "good-faith explanation" for his failure to comply. *See S. New England Tel.*, 624 F.3d at 148; *see also, e.g.*, *Petrisch*, 789 F. Supp. 2d at 455; *Dumann Realty, LLC v. Faust*, No. 09-CV-7651 (VM) (KNF), 2011 WL 2749523, at *4 (S.D.N.Y. July 8, 2011) (finding willfulness under Rule 37(b) in part because the lawyer "provided no reasonable explanation for his failure"); *Stone v. Goord*, No. 07-CV-2826 (LTS) (THK), 2007 WL 3374583, at *2 (S.D.N.Y. Nov. 14, 2007) (same). Third, Liebowitz failed

to comply with the Court's mediation order for several months, *see* Docket Nos. 6, 7 (mediation orders issued on January 17, 2019); Docket No. 14 (close of mediation on April 1, 2019); *see, e.g.*, *Stone*, 2007 WL 3374583, at *3 (finding willfulness in part because of "disobedience of this Court's Order for two months"), and his failure to comply is "not isolated but rather [part of] a pattern" of non-compliance in this case and others, *see S. New England Tel.*, 624 F.3d at 148 (affirming finding of willfulness when failure to comply "was not isolated but rather formed a pattern" of non-compliance); *see, e.g.*, *Pereira*, 2018 WL 5999636, at *3 ("The Court finds particularly concerning Mr. Liebowitz's repeated failures to follow the orders and rules of this Court and others within the district."); *McDermott*, 2018 WL 5312903, at *2 (citing cases, including *Romanowicz v. Alister & Paine, Inc.*, No. 17-CV-8937 (PAE) (KHP), 2018 WL 4762980 (S.D.N.Y. June 22, 2018), and *Ferdman v. CBS Interactive, Inc.*, No. 17-CV-1317 (PGG), 2018 WL 4572241 (S.D.N.Y. Sept. 21, 2018), in which Liebowitz has "been sanctioned for failing to comply with court orders and for failing to produce materials during discovery"); *Steeger*, 2018 WL 1363497, at *1, 3. In short, because the Court finds that Liebowitz willfully disobeyed the Court's orders, it is appropriate to impose sanctions on Liebowitz pursuant to the Court's inherent authority.

## C. Imposition of Monetary Sanctions

**\*5**  Under Rule 16(f), "[i]nstead of or in addition to any other sanction, the court *must* order the party, its attorney, or both to pay the reasonable expenses — including attorney's fees — incurred because of any noncompliance with this rule." Fed. R. Civ. P. 16(f)(2) (emphasis added); *see Chambers*, 501 U.S. at 42 n.8 (noting that Rule 16(f) "provide[s] for the imposition of attorney's fees as a sanction"). That is, under Rule 16(f), "the court must award fees" but "the fees that may be assessed are limited to those incurred as a result of the Rule violation." *Chambers*, 501 U.S. at 42 n.8. By contrast, the Court's inherent power to impose sanctions includes the power to impose, in its discretion, "attorney's fees representing the entire cost of litigation." *Id.* at 45. For example, in *Chambers*, the Supreme Court upheld the finding that "full attorney's fees were warranted due to the frequency and severity of [the lawyer's] abuses of the judicial system

and the resulting need to ensure that such abuses were not repeated." *Id.* at 56.

In light of those principles, the Court finds — pursuant to Rule 16 and its inherent authority — that a single monetary sanction equal to the reasonable attorney's fees incurred by Defendant from April 18, 2019, onward is appropriate. April 18th is the date by which the parties were ordered to conduct mediation. *See* Docket Nos. 6, 7. Thus, from that point on, Liebowitz was unambiguously in violation of the Court's mediation order. And that violation was not without costs: The Court ordered early mediation because, in its experience, "cases of this nature often benefit from early mediation," Docket No. 6; *see also McDermott*, 2018 WL 5312903, at *2 ("In the over 700 cases Mr. Liebowitz has filed since 2016, over 500 of those have been voluntarily dismissed, settled, or otherwise disposed of before any merits-based litigation."), making Liebowitz's failure to mediate a likely cause of additional legal expenses. To the extent that the award also covers time Defendants spent responding to Liebowitz's misconduct — including time wasted responding to settlement demands that the evidence revealed were inappropriate, *see* Lerner Decl. ¶¶ 2, 6 (stating that Defendant produced to Liebowitz evidence of its license in mid-March), and time spent on issues related to sanctions, *see* Time Records 3-4 — such compensation is proper. *See, e.g.*, *Emanuel v. Griffin*, No. 13-CV-1806 (JMF), 2015 WL 1379007, at *18 (S.D.N.Y. Mar. 25, 2015) (ordering the non-compliant counsel to "compensate" defense counsel "for the fees and costs associated with bringing the motion to strike" pursuant to Rule 16(f)); *see also Pichardo*, 2015 WL 13784565, at *1 (awarding under Rule 16(f) attorney's fees incurred in preparing a motion for sanctions). [2]

In opposing a monetary sanction, Liebowitz invokes Rule 11(c)(5)(B) of the Federal Rules of Civil Procedure, which states that "[t]he court must not impose a monetary sanction ... on its own, unless it issued the show-cause order under Rule 11(c)(3) before voluntary dismissal or settlement of the claims." But "Rule 11 does not repeal or modify existing authority of federal courts to deal with abuses under the court's inherent power" and "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Chambers*, 501 U.S. at 48-49. Under this precedent, the Court's inherent authority to impose monetary sanctions

is not subject to Rule 11(c)(5)(B)'s limitations. The same is true for the Court's authority to impose sanctions under Rule 16. *See Huebner*, 897 F.3d at 53-54 (imposing sanctions under Rule 16(f)(1)(B) and 16(f)(1)(C) without any reference to Rule 11); *see also* Fed. R. Civ. P. 16, Advisory Committee Note, 1983 Amendment. Indeed, Rule 16(f)'s mandatory language, which includes only two narrowly defined exceptions (for noncompliance that was "substantially justified" and circumstances that make sanctions "unjust"), suggests that its drafters did not mean for Rule 11 to limit Rule 16. To the contrary, the "intention" of Rule 16(f) was "to encourage forceful judicial management," Fed. R. Civ. P. 16, Advisory Committee Note, Subdivision (f), 1983 Amendment, a goal that would be undermined if parties could simply dismiss a case, *see, e.g.*, *Windstream*, 775 F.3d at 135 ("[T]he harm triggering [the] ... concerns has already occurred upon the mere filing of baseless papers [e]ven if the careless litigant quickly dismisses the action." (internal quotation marks omitted)). Thus, the Court finds that it retains the power under Rule 16(f) and its inherent authority to impose monetary sanctions notwithstanding Rule 11(c)(5)(B) and the voluntary dismissal.

**\*6** The only remaining questions are whether the sanctions should be imposed on Liebowitz alone or also on his firm and the amount of such sanctions. As to the first issue, "[b]ecause Liebowitz's 'actions were indistinguishable from those of [the Liebowitz Law Firm PLLC] as a firm,' the Court [imposes sanctions] against both Liebowitz and the Liebowitz Law Firm PLLC, jointly and severally." *See, e.g.*, *Craig*, 2019 WL 1432929, at *10 (citation omitted) (quoting *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 148 (2d Cir. 2012)).

As to the second, the attorney's fees generated on or after April 18, 2019, are $8,745.50. *See* Time Records 2-4. This is based on just over seventeen hours of work at hourly rates ranging from $180 to $570. *See id.* Even the highest of these hourly rates, at $570, is reasonable for copyright infringement work in the Southern District of New York. *See, e.g.*, *Sid Bernstein Presents, LLC v. Apple Corps Ltd.*, No. 16-CV-7084 (GBD) (KNF), 2018 WL 1587125, at *4 (S.D.N.Y. Mar. 29, 2018) (finding a rate of $630 per hour "within the range of fees recently authorized for similarly experienced attorneys in this District involving copyright infringement actions"); *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 327 F. Supp. 3d 606, 645 (S.D.N.Y.

2018) (approving a $540 hourly rate for a partner); *Owerko v. Soul Temple Entm't, LLC*, No. 13-CV-6420 (RLE), 2016 WL 80664, at *2 n.1 (S.D.N.Y. Jan. 7, 2016) (citing cases awarding up to $650 per hour in S.D.N.Y.). The Court also finds that around seventeen hours of work from April 18th onward is appropriate and reasonable, particularly given that Liebowitz's inappropriate conduct created the need for Defendant to expend additional time on this case. *See* Time Records 3-4 (Defense counsel's activities included a "[c]all with client re: possible Rule 11 motion," "[r]eview[ing] and revis[ing] letter to Liebowitz regarding possible Rule 11," "[t]ravel to and appear at court conference," reviewing the Order to Show Cause and Liebowitz's response, "drafting" and "[r]evising declaration in support of order to show cause," and "[c]onfer[ring] with accounting regarding billing records."). By contrast, Liebowitz's proposed award, for five hours at an hourly rate of $250 equaling $1,250 for the entire case, *see* Docket No. 30 ¶ 16, is entirely unreasonable. *Cf.* Baker v. Urban Outfitters, Inc., 431 F. Supp. 2d 351, 361 (S.D.N.Y. 2006) (approving hourly rates where the opponents did "not seem to contest the reasonableness of the rates"), *aff'd*, 249 F. App'x 845 (2d Cir. 2007).

Thus, the Court finds that Defendant's attorney's fees of $8,745.50 — which represent Defendant's reasonable attorney's fees from April 18 to May 16, 2019 — are reasonable and are properly imposed as sanctions. This sanction is, in the Court's view, sufficient but no greater than necessary to secure compliance with the Court's orders and counsel's professional duties in the future. *See, e.g.*, Macolor, 2015 WL 337561, at *3; Weiss v. Weiss, 984 F. Supp. 682, 686 (S.D.N.Y. 1997) ("[S]anctions should not be more severe than reasonably necessary to deter repetition of the conduct by the offending person ...." (internal quotation marks omitted)). That conclusion is reinforced by Mr. Liebowitz's extensive pattern of non-compliance with court orders in this district. *See, e.g.*, Pereira, 2018 WL 5999636, at *3; McDermott, 2018 WL 5312903, at *2; Steeger, 2018 WL 1363497, at *1, 3.

## CONCLUSION

**\*7** As set forth above, Mr. Liebowitz and his firm are SANCTIONED for his failure to comply with multiple court orders. **Within thirty days of this Opinion and Order**, Mr. Liebowitz and the Liebowitz Law Firm, PLLC, jointly and severally, shall pay monetary sanctions to Defendant **in the amount of $8,745.50**. **Within one week of receipt**, Defendant shall file proof of such payment. The Court continues to retain jurisdiction to impose any additional sanction as necessary.

SO ORDERED.

**All Citations**

Slip Copy, 2019 WL 3000808

Footnotes

1    To the extent that notice is required to impose sanctions pursuant to the Court's inherent authority, *see, e.g.*, Chambers, 501 U.S. at 56; S. New England Tel. Co., 624 F.3d at 148, there is no dispute that the Court's detailed Order to Show Cause provided Liebowitz with the requisite notice, *see* Docket No. 25 ("Plaintiff's counsel is ordered to show cause ... why sanctions should not be imposed — pursuant to Rules 11 and 16 of the Federal Rules of Civil Procedure and/or the Court's inherent authority — for filing a meritless lawsuit; for continuing to prosecute that lawsuit even after being presented with evidence of its lack of merit; for failure to comply with this Court's orders; and for failure to appear as directed at the conference earlier today.").

2    Federal law also "imposes an obligation on attorneys throughout the entire litigation to avoid dilatory tactics, and provides courts with a cudgel to use, in their discretion, to deter unnecessary delays in litigation." Huebner, 897 F.3d at 55. Under 28 U.S.C. § 1927, "[a]ny attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." In light of the sanctions imposed pursuant to Rule 16(f) and the Court's inherent authority, however, the Court need not and does not address the possibility of sanctions under Section 1927. *See, e.g.*, Huebner, 897 F.3d at 56 ("[E]ven if this claim were not frivolous, it would not have been an abuse of discretion to award fees in light of [the attorneys'] ... willful violations of court orders." (internal quotation marks omitted)).

**End of Document**                                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GLEN CRAIG,

                    Plaintiff,

          -v-

UMG RECORDINGS, INC.,

                    Defendant.

16-CV-5439 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff Glen Craig moves for reconsideration of this Court's Opinion and Order dated

March 29, 2019, which granted Defendant's motion for sanctions against Plaintiff's counsel,

Richard Liebowitz and his law firm, for the bad-faith filing of a motion to disqualify one of

Defendant's expert witnesses.[1]  In the alternative, Plaintiff moves for the Court to award

sanctions in an amount less than the total $159,710.76 in attorney's fees and costs that Defendant

has sought.

For the reasons that follow, Plaintiff's motion for reconsideration is denied.  The Court

grants an award that reflects certain reductions to the fees and costs sought by Defendant.

I.       **Legal Standard**

"A motion for reconsideration is 'an extraordinary remedy to be employed sparingly in

the interests of finality and conservation of scarce judicial resources.'"  *Drapkin v. Mafco

Consol. Grp., Inc.*, 818 F. Supp. 2d 678, 695 (S.D.N.Y. 2011) (quoting *In re Initial Pub. Offering*

---

[1] Familiarity with the Court's earlier opinion is assumed.  *See Craig v. UMG Recordings, Inc.*, No. 16 Civ. 5439, 2019 WL 1432929 (S.D.N.Y. Mar. 29, 2019).

In addition, because the Court dismissed Defendants Kingsid Ventures, Ltd. and Estate of Riley B. King in its earlier opinion and order, only one Defendant—UMG Recordings, Inc.— remains in this action.  *Id.* at *10.

Dockets.Justia.com

*Sec. Litig.*, 399 F. Supp. 2d 298, 300 (S.D.N.Y. 2005)).  "The standard for granting . . . a motion [for reconsideration] is strict."  *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). "[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."  *Id.*

## II.  Discussion

### A.    Motion for Reconsideration

Plaintiff asks the Court to reconsider its prior ruling on two principal grounds: (1) that Liebowitz had legitimate reasons to file the motion to disqualify because he was acting to vindicate the interests of his client (Dkt. No. 99 at 3–8); and (2) that Liebowitz held a genuine belief in the merits of the motion to disqualify and so did not act in bad faith (Dkt. No. 99 at 9–16).

Both of these arguments were presented to and rejected by the Court in its earlier ruling. Plaintiff offers no new facts or controlling precedent that compels this Court to reconsider its prior holding, but instead attempts to strengthen the arguments the Court has already rejected. Because it is well settled that "motions for reconsideration are not meant to afford a mere second bite at the proverbial apple," Plaintiff's motion fails.  *Menlo v. Friends of Tzeirei Chabad in Isr., Inc.*, No. 11 Civ. 1978, 2013 WL 1387057, at *1 (S.D.N.Y. Apr. 5, 2013).

In any event, Plaintiff's arguments do not succeed on the merits.

### 1.    Inference of Bad Faith

Plaintiff first argues that this Court failed to acknowledge that Liebowitz filed the motion to disqualify for legitimate purposes and so could not have acted out of bad faith.  (Dkt. No. 99 at 3–8.)  Specifically, Plaintiff raises the following points: (1) bad faith may be inferred only where there is a clear showing of improper purpose (Dkt. No. 99 at 3–4); (2) vindication of a client's

interests is a proper purpose (Dkt. No. 99 at 5–6); (3) the Court has not identified any improper purpose with a "high degree of specificity" (Dkt. No. 99 at 7–8); and (4) the record lacks evidence that Liebowitz violated any legal or ethical rules (Dkt. No. 99 at 8). The Court addresses each step of Liebowitz's argument in turn.

First, the Second Circuit does not require the lower courts to specifically identify an improper purpose in order to infer the bad faith required for the imposition of sanctions under 28 U.S.C. § 1927 ("section 1927"). Rather, the proper standard, as articulated by the Second Circuit, is that "bad faith may be inferred 'only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay.'" *Schlaifer Nance & Co. v. Estate of Warhol*, 194 F.3d 323, 336 (2d Cir. 1999) (quoting *Shafii v. British Airways, PLC*, 83 F.3d 566, 571 (2d Cir. 1996)). To infer bad faith, in other words, a court is required only to conclude that an attorney's actions are completely colorless, and not to identify a particular improper purpose behind those actions. *See New York v. Operation Rescue Nat'l*, 80 F.3d 64, 72–73 (2d Cir. 1996) (affirming trial court's inference of bad faith from the baselessness of attorney's actions, without requiring a finding of any specific improper purpose). The Court thus reaffirms its interpretation of the controlling law and rejects Plaintiff's argument.

Second, vindication of a client's interests, despite being a legitimate motive for filing a motion, *see Schlaifer*, 194 F.3d at 339–40, does not shield Liebowitz from sanctions under section 1927 for "multipl[ying] the proceedings . . . unreasonably and vexatiously." 28 U.S.C. § 1927. After all, Liebowitz may well have had other improper motives *in addition to* the legitimate motive of vindication. Of course, attorneys can be zealous advocates in vindicating a client's interests, but Liebowitz has identified no authority suggesting that attorneys may use

vindication as an excuse to unreasonably and vexatiously multiply the proceedings.  Therefore, Liebowitz's alleged purpose of vindication, standing alone, is insufficient to shield him from sanctions under section 1927 where the Court has concluded that his actions were completely without legal merit.

Third, Plaintiff argues that this Court has not identified any improper purpose "with a high degree of specificity."  (Dkt. No. 99 at 7–8.)  As discussed earlier, the Court is not required to identify any specific improper purpose before inferring bad faith.  To the extent that this Court is required to "make sufficiently specific factual findings to support its conclusion" regarding Liebowitz's bad faith, *Eisemann v. Greene*, 204 F.3d 393, 396–97 (2d Cir. 2000) (per curiam), the Court has already specifically explained in its earlier ruling the basis for its conclusion that Plaintiff's motion to disqualify was so completely colorless as to permit an inference of bad faith, *Schlaifer*, 194 F.3d at 336.

Fourth, Plaintiff contends that the record lacks evidence showing that Liebowitz has violated any legal or ethical rules.  (Dkt. No. 99 at 8.)  But evidence showing the violation of legal or ethical rules is not a prerequisite for the Court to infer bad faith on the part of Liebowitz for filing an entirely colorless motion.  Plaintiff, unsurprisingly, fails to point to any authority supporting his claim.

## 2.  Genuine Belief

Moving on to Plaintiff's second ground for reconsideration—that the Court overlooked evidence demonstrating Liebowitz's genuine belief in the merits of the motion to disqualify—the Court concludes that Plaintiff is wrong.

This Court, in its prior ruling, concluded that Plaintiff's disqualification motion was entirely meritless because it was clear that Plaintiff had not disclosed any confidential information to Sedlik, the expert witness whom Liebowitz had sought to disqualify on the

4

ground that he supposedly had a confidential relationship with Plaintiff.  *Craig v. UMG Recordings, Inc.*, No. 16 Civ. 5439, 2019 WL 1432929, at *10 (S.D.N.Y. Mar. 29, 2019).  This Court then inferred that Liebowitz had acted in bad faith in filing this entirely meritless motion. *Id.*  Plaintiff now argues that Liebowitz actually harbored genuine belief in the merits of the disqualification motion because he believed that certain licensing practices Plaintiff had disclosed to Sedlik were confidential.  (Dkt. No. 99 at 13–15.)  Plaintiff further argues that, because of Liebowitz's genuine belief, his actions were merely the result of "poor legal judgment" and so should not be sanctioned.  (Dkt. No. 99 at 9–10, 14.)

    The evidence in the record refutes Plaintiff's argument.  Plaintiff states that Liebowitz's genuine belief that Plaintiff's licensing history was confidential justified his decision to file the disqualification motion.  (Dkt. No. 99 at 13–14.)  But Liebowitz could not possibly have believed such information to be confidential, because by the time Liebowitz filed the motion, Plaintiff had already disclosed detailed information about his licensing practices and history to Defendant in a non-confidential deposition on March 17, 2017, which Liebowitz himself also attended.  (Dkt. No. 62-6 at 4:3–8 (waiving confidentiality of the deposition), 3:11–12 (reflecting that Richard Liebowitz was present at the deposition).)  In particular, Plaintiff gave detailed accounts of his employment history and past licensing practices.  (Dkt. No. 62-6 at 61:10–23 (Plaintiff's employment as a staff photographer at Hullabaloo), 83:25–86:6 (Plaintiff's licensing practices and prices while at Hullabaloo), 67:5–8 (Plaintiff's employment as a freelance photographer), 70:20–72:6 (Plaintiff's licensing practices and prices as a freelance photographer).)  Furthermore, Plaintiff admitted that he could remember only two instances in which he had licensed his photographs to be used as album covers during his freelance days, and he offered details about each of the two licensing agreements.  (Dkt. No. 62-6 at 75:16–76:14,

77:13–78:6 (licensing terms with CBS), 80:12–81:5 (licensing terms with A&M Records).)

More importantly, Plaintiff stated that he had never licensed the photographs at issue in this case

between 1969 and 2017, despite one failed attempt at licensing them to the BBC.  (Dkt. No. 62-6

at 151:16–152:12 (identifying the photographs at issue), 204:18–206:11 (Plaintiff's licensing

history regarding the photographs at issue).)

Liebowitz was present at this deposition during which Plaintiff made these detailed

disclosures.  (Dkt. No. 62-6 at 3:11–12.)  So he would have known that Plaintiff had already

revealed extensive information about his licensing history to Defendant, and that such

information was not confidential, at least with respect to Defendant.  Undaunted, Liebowitz filed

a letter about seven months later, claiming that Plaintiff had "disclosed confidential information

to Sedlik, including details about Plaintiff's licensing history."  (Dkt. No. 50 at 2.)  Knowing that

Plaintiff's licensing history was no longer confidential to Defendant, Liebowitz could not

possibly have had any genuine belief that this statement had evidentiary support.  Plaintiff's

disqualification motion was meritless from the get-go.

Even assuming Liebowitz had totally forgotten about what his client had testified to at the

deposition and never bothered to refresh his memory, Liebowitz should have realized that his

alleged good-faith belief regarding the confidential nature of Plaintiff's licensing history had

zero factual or legal support when Defendant's brief in opposition to the disqualification motion

pointed him to Plaintiff's earlier disclosures.  (*See* Dkt. No. 61 at 11.)  Facing these glaring

deficiencies in the disqualification motion, Liebowitz responded by arguing that "[i]n a case with

a voluminous record . . . any information that mines the record or publicly available facts is

confidential," and that Sedlik had possessed confidential information up to the point of Plaintiff's

disclosures.  (Dkt. No. 64 at 7–8.)  Liebowitz not only failed to point to any legal authority that

could support his claims, but also neglected to explain how the alleged licensing history information would "mine the record or public available facts" and thus become confidential. (*See id.*)  In sum, his confidentiality claims are entirely meritless.

The Court would certainly exercise restraint in imposing sanctions under section 1927 if the record demonstrated that Liebowitz had simply exercised "poor legal judgment."  *Schlaifer*, 194 F.3d at 340.  But unlike the cases that Plaintiff has cited, in which the attorneys were able to find support either from the record, *id.* at 340 ("[T]he record actually indicates that the appellants did indeed possess some concrete grounding for their belief that their fraud claim had a colorable basis . . . ."), or from the "broad language" in the case law, *Salovaara v. Eckert*, 222 F.3d 19, 29 (2d Cir. 2000), Liebowitz has not pointed to any fact from the record or any authority that could have supported his alleged genuine belief.[2]  Therefore, the Court has no reason to revisit its conclusion that Liebowitz's conduct was not the mere result of poor legal judgment.

Because the Court concludes that Liebowitz could not have had any genuine belief at the time he filed his disqualification motion that Plaintiff's licensing history constituted confidential information, and because the disqualification motion was entirely colorless for the reasons detailed in the Court's prior ruling, the Court reaffirms its inference that Liebowitz acted in bad faith in filing the motion and so sustains its prior ruling.[3]

---

[2] The third case that Plaintiff has cited, *In re Sutter*, 543 F.2d 1030 (2d Cir. 1976), is distinguishable because it concerns the application of a local rule of the U.S. District Court for the Eastern District of New York, rather than section 1927, *see id.* at 1035.

[3] Plaintiff also appears to challenge the Court's conclusion that Plaintiff had not disclosed any confidential information to Sedlik on the grounds that the terms of the protective order the Court has entered to govern discovery in this case might cover Plaintiff's licensing practices. (Dkt. No. 99 at 15–16.)  As discussed earlier, this argument fails on its merits because at the time Liebowitz filed the disqualification motion Plaintiff had already disclosed his licensing practice information to Defendant at a deposition that was not designated as confidential.

## B.    Amount of the Sanction

Plaintiff argues, in the alternative, that the Court should award Defendant less than the full amount it seeks in sanctions.  (Dkt. No. 106.)  The Court earlier held that Defendant is entitled to recover the attorney's fees and costs it incurred in opposing Plaintiff's motion to disqualify and in preparing for and attending the associated evidentiary hearing.  *Craig*, 2019 WL 1432929, at *11.  In accordance with this Court's prior ruling, Defendant has filed a declaration with detailed contemporaneous time and disbursement records to substantiate the amount of recoverable fees and costs it claims to have incurred.  (Dkt. No. 105; *see* Dkt. No. 96 at 22.)  Specifically, Defendant is seeking $92,415.71 in attorney's fees and $67,295.05 in non-taxable costs.  (Dkt. No. 105 ¶ 27.)  In response, Plaintiff urges this Court to limit attorney's fees to $9,225, and non-taxable costs to $3,500.  (Dkt. No. 106 at 1.)  Bearing in mind that section 1927 allows this Court to award only fees and costs that are "reasonably incurred because of" an opposing party's sanctionable conduct, 28 U.S.C. § 1927, the Court now assesses Defendant's requested fees and costs.

### 1.    Attorney's Fees

The Court enjoys "wide discretion" in determining the amount of a fee award.  *Oliveri v. Thompson*, 803 F.2d 1265, 1280 (2d Cir. 1986); *see also Pentagen Techs. Int'l Ltd. v. United States*, 172 F. Supp. 2d 464, 474 (S.D.N.Y. 2001) ("The Court has discretion in determining the appropriate amount of attorney's fees [under section 1927].").  To determine the reasonable amount of attorney's fees in this case, the Court uses the lodestar approach to establish a "presumptively reasonable fee" by calculating the number of hours reasonably expended by counsel in connection with Plaintiff's motion to disqualify and multiplying that number of hours by reasonable hourly rates.  *Millea v. Metro-N. R.R. Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (internal quotation marks omitted).

This Court's determination of a reasonable hourly rate is informed by the prevailing rate "in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). And the relevant community is generally the district in which the Court sits—in this case, the Southern District of New York. *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany*, 522 F.3d 182, 190 (2d Cir. 2008). Here, Defendant requests rates of $828 per hour for partner Barry Slotnick, $618 per hour for senior associate C. Linna Chen, and $361 for paralegal Antoinette Pepper. (Dkt. No. 105 ¶¶ 12, 16, 18.) Plaintiff argues that the requested rates are hyper-inflated and should be reduced. (Dkt. No. 106 at 3–4.)

Bearing in mind the "skill, experience, and reputation" of Defendant's counsel, the Court now assesses the reasonableness of the requested hourly rates. *Blum*, 465 U.S. at 895 n.11. First, the lead counsel in this case, Barry Slotnick, is a widely recognized intellectual property litigator with over forty years of experience. (Dkt. No. 105 ¶¶ 10–11.) As a partner and chair of the Intellectual Property and Entertainment Litigation Practice Group at Loeb & Loeb LLP, an hourly rate of $828 is reasonable. *See Tiffany & Co. v. Costco Wholesale Corp.*, No. 13 Civ. 1041, 2019 WL 120765, at *10 (S.D.N.Y. Jan. 7, 2019) (approving hourly rates between $625 and $845 for partners in a complex copyright infringement action); *see also TufAmerica Inc. v. Diamond*, No. 12 Civ. 3529, 2016 WL 1029553, at *7 & n.7 (S.D.N.Y. Mar. 9, 2016) (approving hourly rate of $747 for a partner in a copyright infringement action).

Second, the requested rate for C. Linna Chen warrants some adjustment. Although Defendant claims that "average hourly rates for senior associates at law firms of comparable size in New York City range from $620 to $815," Defendant does not explain its methodology for reaching this number. (Dkt. No. 105 ¶ 17.) Indeed, the data provided by Defendant does not

specify the prevailing hourly rate for associates with Chen's experience in this District.  (*See generally* Dkt. No. 105-6.)  In light of the rates awarded by other courts in this District, the Court determines that an hourly rate of $550 is reasonable for a senior associate such as Chen.  *See, e.g.*, *Tiffany & Co.*, 2019 WL 120765, at *10 (approving hourly rates between $315 and $585 for an associate, depending on experience); *TufAmerica Inc.*, 2016 WL 1029553, at *6 (approving an hourly rate of $560 for a senior associate with at least ten years of experience).

Third, the billing rate for paralegal Antoinette Pepper is outside the range of rates approved in this District.  Pepper is seeking an hourly rate of $361, but Defendant has not submitted sufficient evidence to establish that the requested rate is commensurate with rates generally approved in the District.  "Recent cases in this district suggest that the prevailing rate for paralegals is between $100 and $200 per hour."  *TufAmerica Inc.*, 2016 WL 1029553, at *6 (citing *Regulatory Fundamentals Grp. LLC v. Governance Risk Mgmt. Compliance, LLC*, No. 13 Civ. 2493, 2014 WL 4792082, at *3 (S.D.N.Y. Sept. 24, 2014)).  Accordingly, the Court determines that $200 is a reasonable hourly rate for Pepper.

Having determined the reasonable hourly rates for Defendant's counsel, the Court now turns to the issue of the reasonable number of hours.  In making this determination, the Court "examines the particular hours expended by counsel with a view to the value of the work product of the specific expenditures to the client's case."  *Errant Gene Therapeutic, LLC v. Sloan-Kettering Inst. for Cancer Research*, 286 F. Supp. 3d 585, 588 (S.D.N.Y. 2018) (quoting *Luciano v. Olsten Corp.*, 109 F.3d 111, 116 (2d Cir. 1997)).  The Court should award attorney's fees only for "hours reasonably expended on the litigation," not for "hours that are excessive, redundant, or otherwise unnecessary."  *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433–34 (1983)).  Bearing that principle in mind, a court may apply an across-the-board reduction to

effectuate the reasonable imposition of fees.  *See Williams v. Epic Sec. Corp.*, 368 F. Supp. 3d 651, 656–657 (S.D.N.Y. 2019) ("Courts in this Circuit have recognized a district court's authority to make across-the-board percentage cuts in hours, as opposed to an item-by-item approach, to arrive at the reasonable hours expended.").

Here, Defendant has submitted detailed contemporaneous timesheets to substantiate the hours requested.  (Dkt. No. 105-8.)  According to Defendant's counsel, they spent 10.3 hours responding to an initial letter from Liebowitz requesting Sedlik's disqualification, 46.6 hours responding to the disqualification motion, and 69.4 hours preparing for and attending the evidentiary hearing.  (Dkt. No. 107 at 5–6.)  Plaintiff argues that the number of hours billed by Defendant's counsel is excessive, but he does not reference any specific disputed time entries. (Dkt. No. 106 at 2.)  Having carefully reviewed the timesheets, the Court concludes that the time expended requires reduction.  As discussed earlier and in this Court's earlier rulings, Plaintiff's motion to disqualify was entirely meritless.  It did not involve complicated legal questions or factual disputes.  Therefore, the Court is not convinced that attorneys with Slotnick's and Chen's experience would have needed to spend a total of 126.3 hours to counter such a meritless motion. In determining the appropriate percentage reduction, "trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time." *Errant Gene Therapeutic*, 286 F. Supp. 3d at 588 (quoting *Fox v. Vice*, 563 U.S. 826, 838 (2011)).  Based on the complexities of this case and the work quality of Defendant's counsel, the Court determines that an across-the-board 30% reduction is reasonable.  Therefore, Defendant is entitled to an award of attorney's fees totaling $64,691.00.

## 2.    Costs

In addition to attorney's fees, Defendant also seeks reimbursement of costs totaling

$67,295.05, consisting of $371.10 in photocopying costs, $17.10 in express mail costs, and

$66,906.85 in expert fees and costs.  (Dkt. No. 105 ¶ 25.)

Plaintiff urges this Court to reduce the requested expert fees and costs, arguing that

expert witness Jeffrey Sedlik's rate is too high and that Sedlik spent too many hours on the

disqualification motion.  (Dkt. No. 106 at 4.)  In response, Defendant argues that the hours

Sedlik billed—91 hours in total—were entirely necessary to the defense.  (Dkt. No. 107 at 7–8.)

Defendant has submitted two invoices to support its claim for expert fees and costs.  The first

one, numbered UMG1701-09, contains a breakdown of Sedlik's billed hours and incurred

expenses, and a contemporaneous timesheet.  (Dkt. No. 105-9 at 5–8.)  It indicates that Sedlik

billed Defendant for 91 hours of work at an hourly rate of $650, resulting in $56,192.50 in fees,

and that Sedlik incurred $3,369.35 in expenses.  (Dkt. No. 105-9 at 5.)  The second invoice,

numbered UMG1701-08A, indicates that Sedlik billed Defendant for another 11.3 hours of work,

adding another $7,345 in fees.  (Dkt. No. 105-9 at 9.)

To determine whether a requested expert's fee is reasonable,

> courts have considered the following factors: (1) the witness's area
> of expertise; (2) the education and training that is required to provide
> the expert insight that is sought; (3) the prevailing rates for other
> comparably respected available experts; (4) the nature, quality and
> complexity of the discovery responses provided; (5) the cost of
> living in the particular geographic area; (6) any other factor likely to
> be of assistance to the court in balancing the interests implicated by
> [Federal Rule of Civil Procedure] 26; (7) the fee actually being
> charged to the party who retained him; and (8) fees traditionally
> charged by the expert on related matters.

*Advanced Video Techs., LLC v. HTC Corp.*, No. 11 Civ. 6604, 2016 WL 1253899, at *7

(S.D.N.Y. Feb. 23, 2016).  It is the burden of Defendant to demonstrate the reasonableness of the

amount claimed.  *Id.*  "When the reasonableness of an expert's fees is not fully explained, the

Court may exercise its discretion to determine a reasonable fee."  *Id.* (quoting *Penberg v.*

*HealthBridge Mgmt.*, No. 08 Civ. 1534, 2011 WL 1100103, at *15 (E.D.N.Y. Mar. 22, 2011)).

After carefully reviewing Defendant's evidence, the Court concludes that Sedlik's fees

require adjustment.  First, Defendant has not submitted any evidence to convince the Court that

Sedlik's hourly rate of $650 is reasonable or commensurate with other experts of similar

backgrounds and credentials.  Second, the contemporaneous timesheet attached to the first

invoice contains little explanation of how Sedlik's time was spent, relying exclusively on vague

entries such as "[c]ommunication" or "[p]rovide written responses," which makes it difficult for

the Court to assess the reasonableness of the time expended.  (*See generally* Dkt. No. 105-9 at 6–

8.)  Third, the second invoice appears questionable because the first invoice already accounted

for the 91 hours that Sedlik billed.  (Dkt. No. 107 at 7 ("In total, Mr. Sedlik . . . billed

Defendant[] for only 91 hours worked.").)  Moreover, the second invoice does not have any

timesheet to justify the 11.3 hours billed by Sedlik.  (*See* Dkt. No. 105-9 at 9.)  In light of the

apparent deficiencies in Sedlik's record, and the straightforward nature of the motion to

disqualify, the Court will implement a 50% reduction to the expert fees sought.  Therefore,

Defendant is entitled to recover $33,841.63 in costs, consisting of $371.10 in photocopying

costs, $17.10 in express mail costs, and $33,453.43 in expert fees and costs.

**III.**     **Conclusion**

For the foregoing reasons, Plaintiff's motion for reconsideration is DENIED.  Defendant

is hereby awarded $98,532.62 in attorney's fees and costs pursuant to 28 U.S.C. § 1927.  Richard

Liebowitz and the Liebowitz Law Firm are jointly and severally liable for this award.

The Clerk of Court is directed to close the motion at Docket Number 98.

SO ORDERED.

Dated: July 9, 2019
       New York, New York

_____
                J. PAUL OETKEN
             United States District Judge

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GLEN CRAIG,

                              Plaintiff,

              -v-                                          16-CV-5439 (JPO)

                                                          OPINION AND ORDER
UMG RECORDINGS, INC., et al.,
                              Defendants.

J. PAUL OETKEN, District Judge:

        Plaintiff Glen Craig ("Craig") is a photographer who took a few good shots of the great

musician Riley B. King, known as "B.B. King."  He brought this lawsuit against UMG

Recordings, Inc. ("UMGI"), Kingsid Ventures, Ltd. ("Kingsid"), and the Estate of Riley B. King

(the "Estate") (collectively, "Defendants") for copyright infringement after UMGI released

several music albums with Craig's photos in them.  Defendants have moved for summary

judgment in favor of Kingsid and the Estate and partial summary judgment in favor of UMGI.  In

addition, Defendants have moved for sanctions against Craig and his counsel, Richard Liebowitz

and the Liebowitz Law Firm PLLC, for filing a meritless motion to disqualify Defendants'

expert witness.  For the reasons that follow, Defendants' summary judgment motion is granted in

part and denied in part.  Defendants' motion for sanctions is granted with respect to Richard

Liebowitz and the Liebowitz Law Firm PLLC.

I.      **Background**

        A.      **Factual Background**

        The following facts are drawn from the complaint and the parties' Rule 56.1 statements

and are not subject to genuine dispute unless otherwise noted.

The renowned Riley B. King ("King"), professionally known as B.B. King, "was one of the greatest guitarists and blues performers of all time."  (Dkt. No. 92 ¶ 1.)  Plaintiff, Glen Craig, is a photographer who took several pictures of King during King's music tours.  (Dkt. No. 1 ("Compl.") ¶¶ 5, 9; *see also* Dkt. No. 92 ¶ 3.)  Among the pictures Craig took, three appeared in a tour book published in 1971 featuring King.  (Dkt. No. 92 ¶ 5.)  It is these three photographs (the "Photographs") that are at issue in this case.  (*See* Dkt. No. 1-1.)

Defendant UMGI is a Delaware corporation in the business of selling, manufacturing, distributing, and otherwise exploiting sound recordings in the United States.  (Dkt. No. 92 ¶¶ 21, 23.)  Craig alleges that UMGI published a series of recordings of King's music that used the Photographs without his permission.  (Compl. ¶ 12.)  He further alleges that Defendant Kingsid—a company organized to license King's name to third parties—and the Estate facilitated and benefitted from UMGI's sales.  (*Id*.; Dkt. No. 92 ¶ 16.)

In his complaint, Craig specifies 43 allegedly infringing albums ("King Albums") that were released at various times between 1971 and 2015.[1]  (*See generally* Compl. ¶¶ 13–55.)  Among them, 29 albums are published outside the United States by foreign corporate entities.  (Dkt. No. 92 ¶ 24.)  All of these entities, except for one, share the "Universal" name or have some affiliation with UMGI's parent company.  (Dkt. No. 92 ¶¶ 21, 25.)  Between July 7, 2013 and July 7, 2016, UMGI sold copies of 13 of the allegedly infringing albums within the United States.  (Dkt. No. 92 ¶ 35.)

Craig registered his copyright for the Photographs in March 2014.  (Dkt. No. 92 ¶ 7.)  In June 2014, Craig reached out to UMGI to retrieve the originals of the Photographs for an

---

[1] Defendants contend that there are only 42 albums at issue because the albums referred to in paragraphs 22 and 39 of the complaint are the same.  But Craig disagrees.  (Dkt. No. 92 ¶ 13.)

exhibition and was provided with copies of certain King CDs that featured the Photographs.
(Dkt. No. 92 ¶¶ 8, 10; *see also* Dkt. No. 80-3.)  Craig's then-attorney subsequently sent a cease-
and-desist letter to UMGI in September 2014, informing UMGI of the alleged infringement.[2]
(Dkt. No. 92 ¶ 11; Dkt. No. 91-3.)  Unable to resolve the matter amicably, Craig initiated this
action against Defendants on July 7, 2016, asserting a Copyright Act claim and a Digital
Millennium Copyright Act ("DMCA") claim.

        **B.**       **Procedural Background**

       At the close of expert discovery, Craig filed a motion to disqualify Defendants' proposed
expert witness, Professor Jeffrey Sedlik ("Sedlik").  (Dkt. No. 55.)  After the parties had fully
briefed this issue, the Court denied Craig's motion following an evidentiary hearing on May 25,
2018.  (Docket Entry on May 25, 2018.)  Defendants then filed a motion for sanctions—pursuant
to 28 U.S.C. § 1927 and this Court's inherent power—against Craig and his counsel, Richard
Liebowitz and the Liebowitz Law Firm PLLC, for fees and expenses in connection with the
motion to disqualify.  (Dkt. No. 71.)  Separately, they also moved for summary judgment.  (Dkt.
No. 77.)  Both motions are now fully briefed and ripe for resolution.

**II.**     **Legal Standards**

        **A.**       **Motion for Summary Judgment**

       Summary judgment is appropriate where "there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is
material if it "might affect the outcome of the suit under the governing law."  *Anderson v.
Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if, considering the record as

---

[2] Defendants contend that the cease-and-desist letter was received by UMGI in November
2014.  (Dkt. No. 92 ¶ 11.)

a whole, a rational jury could find in favor of the non-moving party.  *See Ricci v. DeStefano*, 557
U.S. 557, 586 (2009).

    "On summary judgment, the party bearing the burden of proof at trial must provide
evidence on each element of its claim or defense."  *Cohen Lans LLP v. Naseman*, No. 14 Civ.
4045, 2017 WL 477775, at *3 (S.D.N.Y. Feb. 3, 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S.
317, 322–23 (1986)).  "If the party with the burden of proof makes the requisite initial showing,
the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue
for trial, *i.e.*, that reasonable jurors could differ about the evidence."  *Clopay Plastic Prods. Co.
v. Excelsior Packaging Grp., Inc.*, No. 12 Civ. 5262, 2014 WL 4652548, at *3 (S.D.N.Y. Sept.
18, 2014).  The court views all "evidence in the light most favorable to the non-moving party,"
and summary judgment may be granted only if "no reasonable trier of fact could find in favor of
the nonmoving party."  *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (second quoting *Lund's,
Inc. v. Chem. Bank*, 870 F.2d 840, 844 (2d Cir. 1989)).

### B.    Motion for Sanctions

    To succeed on a motion for sanctions under § 1927 or the court's inherent powers, the
movant must demonstrate "clear evidence that (1) the offending party's claims were entirely
meritless and (2) the party acted for improper purposes."  *Revson v. Cinque & Cinque, P.C.*, 221
F.3d 71, 79 (2d Cir. 2000) (quoting *Agee v. Paramount Commc'ns Inc.*, 114 F.3d 395, 398 (2d
Cir. 1997)); *see also Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir. 1986).  Bad faith can be
established by inference from a party's decision to pursue completely meritless claims.  *See In re
60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 116 (2d Cir. 2000).

III.    **Discussion**

A.      **Motion for Summary Judgment**

The Court begins with the claims under the Copyright Act, and then turns to the claims

asserted under the DMCA.

1.      **Liability under the Copyright Act**

Defendants move for summary judgment on the copyright claims in favor of Kingsid and

the Estate; they move for partial summary judgment in favor of UMGI.  Each is addressed in

turn.

a.      **Liability of Kingsid**

Defendants move for summary judgment on Craig's claims against Kingsid on the

ground that Craig does not adduce any evidence from which a reasonable juror could infer

Kingsid's involvement in the alleged copyright infringement.  (Dkt. No. 78 at 9–10.)  Kingsid is

simply a company organized "to license Mr. King's name to third parties."  (Dkt. No. 92 ¶ 16.)

Craig has failed to adduce any evidence to substantiate his claim that "Kingsid . . . improperly

facilitated and wrongly benefited" from the alleged copyright infringement (Compl. ¶ 12), and

in fact concedes that "the record is insufficiently developed as to [Kingsid's] involvement in the

infringing activity" (Dkt. No. 90 at 2 n.1).  Therefore, the Court grants summary judgment in

Kingsid's favor.  *See Lessem v. Taylor*, 766 F. Supp. 2d 504, 515 (S.D.N.Y. 2011) (granting

summary judgment to entities that had "[no]thing to do with the copyright infringement alleged

in th[e] case").

b.      **Liability of the Estate**

Defendants next argue that summary judgment should also be granted in favor of the

Estate because the record contains no evidence that the Estate has produced, distributed, or

improperly benefited from any of the allegedly infringing albums.  (Dkt. No. 78 at 9–10.)  In

response, Craig contends that a reasonable jury could potentially find the Estate liable because its trustee and executor, Louise LaVerne Toney ("Toney"), reviewed all album releases and received royalties from UMGI.  (Dkt. No. 1 ¶ 8; Dkt. No. 90 at 5.)

To start with, Craig mischaracterizes the record.  Nothing in the deposition excerpt cited by Craig supports his allegation that Toney "receive[d] all album releases from UMGI, *delivered to her for review*."  (Dkt. No. 90 at 5 (emphasis added).)  To the contrary, Toney testified that she has never had any approval power over UMGI's release of albums.  (Dkt. No. 94-1 at 59:8–61:6.)  Therefore, viewed in the light most favorable to Craig, the record can, at best, support the inference that the Estate has received royalties and communications about upcoming album releases.  So, the question is whether receiving communications and royalties in connection with the allegedly infringing albums can render the Estate liable for infringement.  The Court answers this question in the negative.

To establish direct liability for copyright infringement, a plaintiff must show that a defendant has "engaged in some volitional conduct sufficient to show that [it] actively" violated plaintiff's copyright.  *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 148 (S.D.N.Y. 2009); *see also Cartoon Network LP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008) ("[V]olitional conduct is an important element of direct liability . . . .").

"Here, there is no evidence establishing direct liability, since [Craig] cannot point to volitional conduct by [the Estate] that caused" the alleged infringement.  *Zappa v. Rykodisc, Inc.*, 819 F. Supp. 2d 307, 316 (S.D.N.Y. 2011).  Rather than having any hand in producing or marketing the allegedly infringing actions, Toney only passively received royalties and communications about album releases from UMGI.  *Cf. id.* at 319  No evidence in the record shows that Toney delivered the Photographs to UMGI or cooperated in any way with UMGI

6

regarding the use of the Photographs in the album production. Absent such evidence, there is no genuine factual dispute as to whether the Estate has engaged in any volitional conduct that renders it potentially liable for direct infringement. *Cooley v. Penguin Grp. (USA) Inc.*, 31 F. Supp. 3d 599, 611 (S.D.N.Y. 2014) (holding that even a vicarious liability claim predicated on the receipt of royalties from an infringing product requires some showing that the defendant "had the power to stop the infringements"). The Estate is entitled to summary judgment on all of Craig's claims against it.[3]

### c.      Liability of UMGI (Foreign Albums)

UMGI argues that it cannot be held liable for the 29 allegedly infringing albums ("Foreign Albums") released outside the United States by foreign corporate entities. UMGI makes three arguments: (1) UMGI did not manufacture or distribute the Foreign Albums, (2) UMGI and the foreign affiliates that released the Foreign Albums are separate corporate entities, and (3) the Copyright Act does not cover extraterritorial infringements. (Dkt. No. 78 at 10–12.) The Court begins with UMGI's argument regarding the extraterritorial application of the Copyright Act.

"It is well established that copyright laws generally do not have extraterritorial application." *Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988). But if a defendant (1) commits a predicate infringing act—such as the unauthorized manufacture of copyrighted material—in the United States, and (2) the act permits further reproduction abroad, the defendant might be liable for related infringing acts occurring outside the country. *See Robert Stigwood Grp. Ltd. v. O'Reilly*, 530 F.2d 1096, 1101 (2d Cir. 1976).

---

[3] Craig does not make any allegations as to the Estate's vicarious or contributory infringement, so the Court need not discuss these alternative theories of liability.

Among the Foreign Albums, Craig fails to adduce any evidence to show that UMGI has committed any predicate act with regard to 21 of them. UMGI is therefore entitled to summary judgment with respect to claims related to these albums. As to the remaining eight Foreign Albums that are named as "Ladies and Gentlemen, Mr. B.B. King" (the "LG Albums"), the evidentiary record compels a different result. (Compl. ¶¶ 23–24, 33–38.)

In particular, the evidentiary record could support the inference that UMGI has, through its employee Ryan Null ("Null"), transmitted an unauthorized copy of one of the Photographs (the "Star Photograph") from within the United States to UMGI's UK affiliate to produce an album named "Ladies and Gentlemen, Mr. B.B. King." (Dkt. No. 91-1 ("Null Depo.") at 129:4–9.) The evidentiary record would also allow a reasonable jury to conclude that the LG Albums have used the Star Photograph as their album covers.[4] (*See* Dkt. No. 1, ¶¶ 23–24, 33–38; *compare* Dkt. No. 1-1 at 2, *with* Dkt. Nos. 1-12, 1-13, 1-22–1-27.) The question is whether UMGI's transmission of an unauthorized copy of the Star Photograph from within the United States would constitute a domestic copyright infringement that "permits further reproduction abroad." *Robert Stigwood Grp. Ltd.*, 530 F.2d at 1101.

UMGI argues that its conduct does not amount to a predicate act because it was "the UK [a]ffiliate, not Mr. Null or UMGI, [that] chose to use the [infringing photo]." (Dkt. No. 93 at 5.) Yet UMGI's argument is a non sequitur. Copyright laws protect a creator's reproduction right. 17 U.S.C. § 106(1). In particular, "[c]ourts have consistently held that the unauthorized duplication of digital . . . files over the Internet infringes a copyright owner's exclusive right to reproduce." *Capitol Records, LLC v. ReDigi Inc.*, 934 F. Supp. 2d 640, 648 (S.D.N.Y. 2013). In

---

[4] UMGI never disputes that the cover photos of the LG Albums are derived from the Star Photograph.

addition, "unauthorized transfer of a digital . . . file over the Internet" also "constitutes reproduction within the meaning of the Copyright Act." *Id.* Null admitted in his deposition that he pulled out the Star Photograph from UMGI's digital files and sent it to UMGI's UK affiliate to produce an album named "Ladies and Gentlemen, Mr. B.B. King." (Null Depo. at 128:15–129:9, 131:22–132:6; 132:12–22.) Null's acts of pulling the Star Photograph from a database and sending it over the Internet to the UK affiliate necessarily involve the acts of duplicating and transferring a digital file over the Internet. Therefore, even assuming that Null and UMGI did not make the decision to use this photo in the album, Null's unauthorized transfer of this photo—in which Craig allegedly holds the copyright—is sufficient to constitute a predicate act for purposes of the Copyright Act. *Capitol Records*, 934 F. Supp. 2d at 648–51 (holding that unauthorized online transfer of digital musical files infringes copyright owner's reproduction right); *Update Art, Inc.*, 843 F.2d at 73 (observing that illegal reproduction of a copyrighted work in the United States constitutes a predicate act).

Having concluded that the evidence could support the inference that UMGI, through its employee Null, committed a predicate act of infringement in the United States, the Court next considers whether the act is one that "permits further reproduction abroad." *Robert Stigwood Grp. Ltd.*, 530 F.2d at 1101. As a matter of law, sending a digital photograph to someone abroad enables that foreign user to make additional infringing copies. Consequently, UMGI could be liable for the sale of the LG Albums that have used an unauthorized copy of the Star Photograph.

Given that the bar on the extraterritorial application of the Copyright Act does not shield UMGI from liability in connection with the LG Albums, the Court next considers UMGI's other two arguments in support of partial summary judgment.

Those two arguments miss the point.  The crux of Craig's theory of liability is not that

UMGI manufactured or distributed the Foreign Albums or that the corporate veil between UMGI

and its foreign affiliates ought to be pierced.  Instead, Craig argues that UMGI's liability arises

from its alleged reproduction and transmission of an infringing photograph to its UK affiliate.

(Dkt. No. 90 at 7–8.)  Therefore, even accepting that UMGI did not manufacture or distribute the

Foreign Albums, and that the corporate distinctions between UMGI and its affiliates are to be

respected, to the extent that a reasonable jury could find that UMGI committed a domestic

infringement that enabled its foreign affiliates to commit further infringements abroad, UMGI

can be liable for those further infringements under the governing law.  *Robert Stigwood Grp.*

*Ltd.*, 530 F.2d at 1101; *Update Art, Inc.*, 843 F.2d at 73.

Therefore, Defendants' motion for summary judgment is denied with respect to the

claims against UMGI related to the LG Albums, and is granted with respect to the claims related

to the remaining Foreign Albums.

## 2.      Damages Under the Copyright Act

The Court next turns to the question of damages.  Defendants seek to limit the scope of

potential damages in several ways.  They argue that (1) Craig's damages award should be limited

to damages arising from sales that occurred between July 7, 2013 and July 7, 2016, (2) Craig's

actual damages should be limited to $9,452.21, (3) Craig is not entitled to any of UMGI's profits,

(4) Craig is not entitled to any statutory damages, and (5) even if Craig is granted statutory

damages, Craig's award should be limited to the amounts recoverable for innocent infringement.

The Court addresses each proposed limitation in turn.

### a.      Statute of Limitations

Defendants first argue that, to the extent that any damages are awarded, they should be

limited to those arising from sales that occurred within three years of the filing of this suit—sales

that occurred between July 7, 2013 and July 7, 2016.[5] (Dkt. No. 78 at 12–13.) Craig contends

that damages should be calculated on the basis of sales from July 7, 2013 to the present. (Dkt.

No. 90 at 9.) The Court agrees with Craig that the period for which damages are available is July

7, 2013 to the present.

Any civil action asserting a claim based on a Copyright Act violation must be brought

within three years after the accrual of the claim. 17 U.S.C. § 507(b). This Circuit has adopted

the "discovery rule" to determine when a plaintiff's copyright claim accrues. *Psihoyos v. John

Wiley & Sons, Inc.*, 748 F.3d 120, 124–25 (2d Cir. 2014). Under this rule, a plaintiff's claim

accrues when "the copyright holder discovers, or with due diligence should have discovered, the

infringement." *Id.* at 124. After a plaintiff has established the timeliness of his or her claim with

respect to any one particular act, courts in this Circuit have taken a "rolling" approach to the

calculation of damages with respect to any other acts of infringement, which allows a plaintiff to

recover damages for only those infringing acts that occurred within three years of the filing of

the complaint. *Papazian v. Sony Music Entm't*, No. 16 Civ. 7911, 2017 WL 4339662, at *4

(S.D.N.Y. Sept. 28, 2017) (citing *Merchant v. Levy*, 92 F.3d 51, 57 n.8 (2d Cir. 1996)).

The parties agree that for purposes of calculating damages, the Court may rely on only

those acts of infringement that have occurred since July 7, 2013—three years prior to the filing

of this suit. (*Id.*) But they fight over whether Craig can collect damages for acts of infringement

that have occurred *after* he filed his lawsuit. (Dkt. No. 90 at 9; Dkt. No. 93 at 5.)

---

[5] Defendants also argue that damages should be further limited to damages that arise from the sales of thirteen specific albums that, as Craig concedes (Dkt. No. 92 ¶ 35), were the only albums UMGI sold in the United States during this period. But, as the Court has already held, UMGI may also be liable for foreign sales of the LG Albums in addition to the domestic sales of these thirteen albums.

Defendants' argument is counterintuitive.  According to Defendants' logic, a plaintiff would have to file continuous complaints to capture damages from violations occurring *after* he or she has already filed the first lawsuit that put a defendant on notice of the alleged infringement.  Such a rule is contrary to the speedy and efficient resolution of disputes and conservation of judicial resources.  Indeed, none of the authorities cited by Defendants supports their argument.  Instead, those cases discuss how far *back* in time from the filing of the complaint damages would extend, rather than whether a plaintiff can recover damages for ongoing damages *after* the filing of the complaint.  *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 677 (2014) ("[A] successful plaintiff can gain retrospective relief only three years back from the time of suit."); *Papazian*, 2017 WL 4339662, at *6 ("Plaintiff cannot recover damages for infringing acts that occurred . . . three years before he filed his complaint.").

The Court declines to follow Defendants' invitation to limit the damages period to the filing of the complaint.  Therefore, July 7, 2013 to the present (the "Relevant Period") is the proper time period for purposes of calculating damages.  To sum up, Craig's maximum damages are limited to those arising from the sale of the 13 albums in the United States and the LG Albums abroad between July 6, 2013 and the present.

### b.      Actual Damages

The Copyright Act entitles copyright owners to two types of compensatory damages: actual damages and infringers' profits.  17 U.S.C. § 504(a)(1).  These two types of damages serve different purposes and are based on different financial data.  *See On Davis v. The Gap, Inc.*, 246 F.3d 152, 159 (2d Cir. 2001).  Here, Defendants seek to cap Craig's actual damages at $ 9,452.21 on the basis of their expert opinion.  (Dkt. No. 78 at 13–15.)  Craig objects to

Defendants' figure by questioning the adequacy of Defendants' expert opinion.  (Dkt. No. 90 at 11–12.)

Defendants' $ 9,452.21 calculation takes into account only the thirteen albums sold in the United States, and not any of the Foreign Albums.  (Dkt. No. 62-7 at 9, 27–28.)  As the Court explained above, UMGI's liability for the LG Albums sold abroad is still a triable issue. Therefore, the Court cannot conclude at the summary judgment stage that no factual dispute exists as to the maximum amount of actual damages to which Craig might be entitled. Defendants' motion for summary judgment with respect to the actual damages calculation is denied.

### c.    Infringers' Profits

Next, the Court turns to infringers' profits.  The Copyright Act awards infringers' profits to ensure that infringers do not benefit from their wrongdoing.  *On Davis*, 246 F.3d at 159.  The statute adopts a burden-shifting framework: first, "the copyright owner is required to present proof only of the infringer's gross revenue," and second, "the infringer is [then] required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work."  17 U.S.C. § 504(b).  The Second Circuit interprets "gross revenue" under the Copyright Act as "gross revenue reasonably related to the infringement, not unrelated revenues."  *On Davis*, 246 F.3d at 160.

Here, the parties dispute whether Craig has carried his initial burden of adducing evidence of any "revenues reasonably related to the infringement."  *Id.*  Craig has set forth the gross revenue earned by UMGI in 2014–2016 from the sale of the allegedly infringing albums in his expert's opinion.  (Dkt. No. 80-6 at 5.)  But Defendants attack the "causal connection" between the Photographs and UMGI's revenue from selling the allegedly infringing albums.

(Dkt. No. 78 at 16.) According to Defendants, the Photographs and UMGI's revenue are not "reasonably related," *On Davis*, 246 F.3d at 160, because "all of UMGI's profits are attributable to Mr. King" (Dkt. No. 78 at 17).

The evidence in the record, interpreted in the light most favorable to non-movant Craig, is sufficient to lead a reasonable jury to conclude that UMGI's revenues from selling the King Albums are reasonably related to the allegedly infringing photographs. The Photographs used as album covers feature prominently on those albums. Indeed, the Photographs are most likely the first things that catch a customer's eye when she is browsing the shelves either in a physical store or online. It is true that King is a great musician and that many people purchase his albums solely for the music. But it would be disingenuous to argue that the cover design does not affect the overall quality of an album, customers' willingness to buy, and, consequently, album sales. As UMGI itself admits, "[UMGI] really [is] careful about what [it] choose[s] for a cover." (Null Depo. 39:11–12.) Indeed, its employees are expected to "research as many [photographs] as [they] need to until [they] find the correct photo that's appropriate or the correct creative choice that the art director or the designer or anyone else would approve to be used from a creative standpoint," because UMGI is "more concerned with the cover . . . than what shows up inside." (*Id.* 38:16–21, 39:14–15.) It cannot be said to be beyond genuine dispute that the revenues are not reasonably related to the photographs,

The cases cited by UMGI are inapposite. The out-of-circuit case *Mackie v. Rieser*, 296 F.3d 909 (9th Cir. 2002), discusses the relationship between an infringing artwork used in a promotional brochure for the Seattle Symphony Orchestra and the current and future profits the Orchestra generated after using that photo, *id.* at 911. There, the infringing artwork was in only "one page in a multi-page brochure that advertised a series of concerts that were unrelated to the

artwork itself." *Id.* at 916.  It is distinguishable because the Photographs here feature King himself and are probably the most important image component of the albums.  Also, unlike the three-second appearance of an infringing design in a 44-minute broadcast which "[o]ne could miss . . . in a blink of the eye," the Photographs used in the infringing albums are at the front and center of each album sold.  *Mager v. Brand New Sch.*, No. 03 Civ. 8552, 2004 WL 2413978, at *4 (S.D.N.Y. Oct. 28, 2004).  In short, the evidence in the record "is sufficient to lead a reasonable jury to conclude that [UMGI's album sales] are reasonably related to the allegedly infringing photographs." *Laspata DeCaro Studio Corp. v. Rimowa GmbH*, No. 16 Civ. 934, 2018 WL 3059650, at *7 (S.D.N.Y. June 20, 2018).  Therefore, UMGI's motion for summary judgment as to Craig's claim for infringers' profits is denied.

### d.       Statutory Damages and Attorney's Fees

In addition to actual damages and infringers' profits, a copyright owner may elect instead to seek statutory damages against copyright infringers under the Copyright Act.  17 U.S.C. § 504(a)(2).  A court may also award a reasonable attorney's fees to a prevailing plaintiff.  17 U.S.C. § 505.  Nonetheless, as a precondition to obtaining statutory damages and attorney's fees, a plaintiff must have registered its copyright before the alleged infringement.  17 U.S.C. § 412; *see also Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1012 (2d Cir. 1995).

It is not disputed that Craig registered his copyright for the Photographs in March 2014. (Dkt. No. 92 ¶ 7.)  Therefore, Craig is not entitled to recover statutory damages or attorney's fees for those alleged infringements that occurred prior to March 2014.  But Craig points out that in November 2015—after his registration—UMGI released yet another album named *Ladies and Gentlemen Mr. B.B. King* (the "2015 Album") containing one of the Photographs.  (*See* Dkt. No. 92 ¶ 35(i).)  Because the 2015 Album was released after the copyright registration, it could

potentially entitle Craig to statutory damages.  At issue is whether Craig would be entitled to

seek statutory damages and attorney's fees for UMGI's 2015 Album if Craig succeeds in

establishing UMGI's liability in this action.

Defendants argue that the 2015 release is merely a re-packaging of an earlier album

named *Ladies and Gentlemen Mr. B.B. King* (the "2012 Album") that was initially released in

2012, prior to Craig's copyright registration.  (Dkt. No. 78 at 19.)  As a so-called re-packaging of

the 2012 Album, Defendants contend, the 2015 Album is a continuation of the alleged

infringement that commenced prior to Craig's registration in 2014.  (Dkt. No. 78 at 19.)  In

opposition, Craig claims that the 2015 Album constitutes a separate act of infringement that

commenced after the registration of the copyright.  (Dkt. No. 90 at 14–15.)

Courts in this District have consistently applied a bright-line rule in cases where the first

act of infringement in a series of ongoing infringements occurred prior to the work's copyright

registration.  *See, e.g.*, *Solid Oak Sketches, LLC v. 2K Games, Inc.*, No. 16 Civ. 724, 2016 WL

4126543, at *2–4 (S.D.N.Y. Aug. 2, 2016); *Steele v. Bell*, No. 11 Civ. 9343, 2014 WL 1979227,

at *9 (S.D.N.Y. Mar. 28, 2014); *U2 Home Entm't, Inc. v. Hong Wei Int'l Trading, Inc.*, No. 04

Civ. 6189, 2008 WL 3906889, at *15–16 (S.D.N.Y. Aug. 21, 2008).  "[W]hen the same

defendant infringes on the same protected work in the same manner as it did prior to the work's

registration, the post-registration infringement constitutes the continuation of a series of ongoing

infringements."  *Solid Oak Sketches*, 2016 WL 4126543, at *3.  For example, an updated version

of a video game released two years after its original is part of the same ongoing infringement.

*See id.*  Similarly, a "newly configured version of [a television] program" with a different title

also constitutes a continuation of the program's earlier infringement.  *Irwin v. ZDF Enters.*

*GmbH*, No. 04 Civ. 8027, 2006 WL 374960, at *2 (S.D.N.Y. Feb. 16, 2006); *see also id.* at *6.

Here, Craig does not cite any of these cases, much less attempt to distinguish them.  The record clearly indicates that the 2015 Album is part of an ongoing infringement that commenced with the release of the 2012 Album.  The 2015 Album has the same front cover and back cover as the 2012 Album, uses the same four photographs that appeared in the 2012 Album, and contains the same seventeen musical compositions and sound recordings that appeared in the 2012 Album.  (Dkt. No. 83 ¶ 4.)  The only difference is that the 2015 Album has fewer tracks and photographs than the 2012 Album.  (Dkt. No. 83 ¶ 5.)  In essence, by releasing the 2015 Album, UMGI infringed the same photographs in the same manner as it had done in releasing the 2012 Album.  It is therefore beyond genuine dispute that the 2015 Album "constitutes the continuation of a series of ongoing infringements" that commenced with the 2012 Album.  *Solid Oak Sketches*, 2016 WL 4126543, at *3.

In arguing to the contrary, Craig maintains, based on Null's deposition, that "UMGI employees concede that by their own standards the 2015 release is considered a new compilation."  (Dkt. No. 90 at 14.)  But Craig's argument misrepresents the record.  Nowhere in Null's deposition excerpt submitted in the record does Craig's counsel or Null directly refer to the 2015 Album.  (*See generally* Null Depo.)  Viewing all evidence in the light most favorable to Craig, the closest he has come to probing the question of the 2015 Album's novelty is when his counsel asked Null if it would be unusual for UMGI to use the same cover from an old album in a new compilation, implicitly referring to the 2012 Album and the 2015 Album.  (Null Depo. 61:2–8.)  But Null categorically rejected such a possibility, stating that "[a] compilation would have new art . . . .  We wouldn't do that."  (*Id.* 61:9–13.)  According to Null, a new compilation would have new a cover photo, new title, and new track list, and would therefore constitute a completely new collection.  (*Id.* 40:9–12, 40:25–41:2, 59:16–60:2, 61:17–20.)  The 2015 Album,

which pulls its cover, title, and songs from the 2012 Album, does not fit Null's "new compilation" description.

Craig argues that construing the concept of "continuing infringement" in this way will reduce the deterrent effect that the Copyright Act's statutory damages provision has against potential infringers. (Dkt. No. 90 at 14.) The Court is not persuaded. "A defendant who continues infringing after registration will be subject to liability for actual damages, disgorgement of profits," and a possible injunction. *Steele*, 2014 WL 1979227, at *9. Such remedies are often sufficient to deter potential infringers and compensate copyright owners for their losses, thus serving the statutory purpose of deterring copyright infringement. In light of Craig's otherwise available remedies, the Court rejects Craig's argument and joins the other courts in this District that have adopted a bright-line rule. *Solid Oak Sketches, LLC*, 2016 WL 4126543, at *2–4; *Steel*, 2014 WL 1979227, at *8–9; *U2 Home Entm't, Inc.*, 2008 WL 3906889, at *15–16.

Because the alleged infringements occurred before Craig's registration of his copyright, UMGI is entitled to summary judgment on claims of statutory damages and attorney's fees. Because the Court denies statutory damages for Craig, the Court need not reach the remainder of Defendants' damages arguments.

### 3. Liability Under the DMCA

Finally, Defendants move for summary judgment on Craig's DMCA claims. "The DMCA prohibits, among other things, 'intentionally remov[ing] or alter[ing] any copyright management information.'" *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 107 (2d Cir. 2014) (alterations in original) (quoting 17 U.S.C. § 1202(b)). Copyright management information ("CMI") includes the title and other information identifying the work and its author. 17 U.S.C. § 1202(c). To establish a DMCA violation under § 1202(b)(1), a plaintiff must

18

establish "(1) the existence of CMI on the [infringed work]; (2) removal and/or alteration of that information; and (3) that the removal and/or alteration was done intentionally." *Gattoni v. Tibi, LLC*, 254 F. Supp. 3d 659, 664 (S.D.N.Y. 2017) (alteration in original) (quoting *BanxCorp v. Costco Wholesale Corp.*, 723 F. Supp. 2d 596, 609 (S.D.N.Y. 2010)). Alternatively, a defendant may be liable under § 1202(b) for "distribut[ing copyrighted work] . . . knowing that copyright management information has been removed or altered without authority of the copyright owner or the law." 17 U.S.C. § 1202(b)(3).

Here, Craig fails to present sufficient evidence to satisfy the intention prong under § 1202(b)(1) or the knowledge prong under § 1202(b)(3). Defendants argue that, even assuming the Photographs had CMI, it was removed by a third party prior to 1971, when the Photographs appeared without CMI in a music tour book. (Dkt. No. 78 at 24; *see also* Dkt. No. 79 ¶ 5; Dkt. No. 62-6 ("Craig Depo.") 55:13–25.) Craig neither adduces any evidence nor presents any alternative theory to rebut Defendants' claim. Nothing in the evidentiary record indicates that Defendants either intentionally removed the CMI or had reason to know that the CMI had been improperly removed when releasing the infringing albums. There is not even any evidence suggesting whether there was CMI on the Photographs when Defendants obtained them. Without any evidence from which the Court can draw a favorable inference for Craig, the Court must grant summary judgment in favor of Defendants with respect to the DMCA claim.

### B. Motion for Sanctions

Defendants invoke 28 U.S.C. § 1927 and the court's inherent powers to sanction Craig, his counsel Richard Liebowitz, and the Liebowitz Law Firm PLLC for filing a meritless motion to disqualify Defendants' expert, Sedlik.

Under § 1927, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs,

expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927.

To succeed under § 1927, a plaintiff must demonstrate "clear evidence that (1) the offending

party's claims were entirely meritless and (2) the party acted for improper purposes." *Revson*,

221 F.3d at 79 (citing *Agee*, 114 F.3d at 398). The second prong—bad faith—can be established

by inference from completely meritless actions. *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d at

116; *see also Oliveri*, 803 F.2d at 1273 ("[A]n award under § 1927 is proper when the attorney's

actions are so completely without merit as to require the conclusion that they must have been

undertaken for some improper purpose such as delay."). Awards pursuant to § 1972 may be

imposed only against the attorney, not the client. *Id.*

     As became obvious at the evidentiary hearing on May 25, 2018, Craig's motion to

disqualify was entirely meritless. In order to have Sedlik disqualified, Craig had to show at least

that (1) it was objectively reasonable for him to believe that he had a confidential relationship

with Sedlik, and (2) he actually disclosed confidential information to Sedlik. *Rodriguez v.

Pataki*, 293 F. Supp. 2d 305, 311 (S.D.N.Y. 2003).

     In his motion to disqualify, Craig alleged through his counsel, and stated in a declaration,

that he had disclosed confidential information to Sedlik in a phone call which he thought was

confidential. (Dkt. No. 56 at 1–2.) But the evidentiary hearing revealed that Craig did not

disclose any confidential information to Sedlik. Contrary to what Craig's counsel has

mischaracterized as "explain[ing] the whole theory of the case to Mr. Sedlik" (Dkt. No. 56 at 7),

what Craig told Sedlik was simply the basic facts of the case, his career path, and his licensing

history—none of which can be categorized as confidential (Dkt. No. 73-1 ("Hrg. Trs.") 6:7–23).

The only allegedly "confidential" information—the discussion on Getty Image licensing fees—

was not only told *by* Sedlik *to* Craig, but also publicly available. (*Id.* 13:24–14:2, 22:9–16.) In

fact, Craig also admitted that he let Sedlik lead the conversation on pricing and had little to contribute. (*Id.* 16:2–4, 24:4–7.) Nothing from Craig's testimony can be characterized as "litigation" or "settlement strategy." (Dkt. No. 64 at 6–7.)

In addition to the utter lack of merit to Craig's motion to disqualify, the Court concludes that the motion was made vexatiously and in bad faith. Bad faith can be inferred if the action is completely without merit. *In re 60 E. 80th St. Equities, Inc.*, 218 F.3d at 116. Such is the case here. With the full knowledge that Craig had not disclosed any confidential information, Liebowitz went ahead and filed this meritless motion. Liebowitz's bad faith is most evident in the omission of the details of the alleged conversation in the moving papers. Those details were fatal to Craig's motion, and obviously so under a basic understanding of the applicable law.

Plaintiff's counsel forced Defendants to prepare papers opposing his motion, and required the Court to hold a wasteful evidentiary hearing. Such unnecessary delay and expense is precisely what Congress sought to eradicate when enacting § 1972. *Oliveri*, 803 F.2d at 1273 ("[T]he purpose of [§ 1927] was to deter unnecessary delays in litigation." (quotation marks and citation omitted)). Therefore, an award against Liebowitz and his firm pursuant to § 1972 is proper.

The inherent powers of the Court also allow it to sanction parties and attorneys who have "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258–59 (1975) (quoting *F.D. Rich Co. v. U.S. ex rel. Indus. Lumber Co.*, 417 U.S. 116, 129 (1974)). The standard for imposing sanctions pursuant to the Court's inherent power is the same as that under § 1972: "(1) the offending party's claims were entirely meritless and (2) the party acted for improper purposes." *Revson*, 221 F.3d at 79. The Court's inherent powers also support an award of sanctions here.

Because Liebowitz's "actions were indistinguishable from those of [the Liebowitz Law Firm PLLC] as a firm," *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 148 (2d Cir. 2012), the Court awards costs and fees against both Liebowitz and the Liebowitz Law Firm PLLC, jointly and severally.

The Court declines to sanction Craig himself. The basis for inferring bad faith is weaker as to Craig. *See In re 60 E. 80th St. Equities, Inc.*, 218 F.3d at 116 (allowing the inference of bad faith from completely meritless actions in the context of § 1927). As distinct from Liebowitz, Craig is a layperson who lacks the legal acumen to assess the viability of his disqualification motion under the law. He may not have known that the motion was legally colorless before agreeing to its filing. Without any particularized showing of bad faith as to Craig, the Court will not impose sanctions on Craig.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part. All claims against Defendants Kingsid Ventures, Ltd. and the Estate of Riley B. King are dismissed.

Defendants' motion for sanctions is GRANTED as to Richard Liebowitz and the Liebowitz Law Firm PLLC, and DENIED as to Plaintiff Glen Craig. Defendants shall submit, on or before April 26, 2019, a declaration with detailed contemporaneous time and disbursement records to substantiate the amount of fees and costs incurred in opposing Craig's motion to disqualify and preparing for and attending the evidentiary hearing.

The Clerk of Court is directed to close the motions at Docket Numbers 71 and 77.

SO ORDERED.

Dated: March 29, 2019
      New York, New York

J. PAUL OETKEN
United States District Judge